Good morning, counsel. Our next case for today is case number 415-0016, and that case is Snow vs. SIU Healthcare. For the appellant, we have Mr. Unrath, and for the affilee, Mr. Lee. Are you ready to proceed, counsel? Yes, ma'am. You may do so. Good morning. My name is Craig Unrath. I represent the defendant appellee appellants, SIU Healthcare. This case asks the question, what is the effect of a pleading under 2-610B that states that the defendant desires to contest damages only? Well, the obvious purpose of that pleading is to limit the issues for trial. Elements of duty are admitted, are no longer contested. The pleading also admits that the defendant engaged in negligent conduct and that this conduct approximately caused injury resulting in damages. But in calculating those damages, the question naturally arises as to which of plaintiff's injuries were approximately caused by that negligent conduct. If there is only one injury, such as a car accident, a slip and fall, then the trial becomes fairly simple. It's just a matter of determining the reasonable medical bills, damages for pain and suffering, disability, and so forth. But in cases involving multiple injuries, issues of approximate cause are by necessity interwoven with the issue of damages. The trial inevitably requires an inquiry as to the specific injuries that can be attributed to the negligent conduct. Well, so you're drawing a distinction between conceding negligence and conceding liability? No, Your Honor. I don't see that there's any distinction there. I think that it's an issue of approximate cause. Well, as I understand it, for a medical malpractice case, you have to prove three things. One is that there is a breach of the standard of care. The second is the breach was the approximate cause. And the third was damages suffered. Isn't that right? That's correct, Your Honor. So the second is approximate cause. So you can be negligent. There can be, as in this case, they did something bad here that they shouldn't have administered chemotherapy in the fashion they did. We were negligent in doing that, says the hospital, right? That's correct. Okay. But the second element, the probable cause, is what you're contesting, isn't it? Approximate cause. Approximate cause? Yes, Your Honor. Okay. So if you're challenging approximate cause, then isn't that different from conceding liability? I'm trying to determine what we're talking about here. We are certainly contesting liability for any damages arising from conduct that is not unrelated to the admitted negligent conduct. In other words, any injury that was either pre-existing or caused by other matters, other conduct, is not, there is no liability. Well, here's my problem with the position of the defendant in this case. And my concern is that the court might have been misled. My sympathies are always with the trial judge. It seems to me that you can say, we concede we were negligent, but we're challenging the approximate cause claim that our negligence caused these damages. That's essentially what you're saying, isn't it? Yes. As opposed to saying we're conceding everything but damages, which was your original statement, which seems to me to be saying we're conceding both that we were negligent and approximate cause, but we're claiming that the damages that the plaintiff is seeking are too high. And we want to challenge that. Counsel, let me ask you this in response to Justice Steigman's question. Is the difference, which you pointed out when you started your opening remarks, the fact that we have multiple injuries here? That's correct, Your Honor. So how does that play into the inquiry that Justice Steigman just made? As I pointed out, if we have just a single injury, then a trial on damages only becomes very simple. It's very straightforward. But where we have multiple injuries, at some point the court must, by necessity, inquire as to what damages are related to the negligent conduct. Let me ask you this. Could you have filed an answer saying that we're admitting this is going to be a trial as to damages only? And could you have been more specific in saying we do not agree that the damages represented by plaintiff are all attributable to our negligence? Would that have been clearer? In hindsight, yes, Your Honor. It would have been much clearer. However, we believe our trial counsel was operating under the assumption that a court would never award damages for injuries that were unrelated to the admitted negligent conduct. But to say that you desire to contest only the amount of damages in this case doesn't necessarily suggest in any way that that's the case. There's a separate proximate cause issue. All that could mean is the damages they're asking for are just too great. We're not contesting our liability in any way, but the damages are too great. Why wouldn't that be something which that statement could communicate to the trial court? The damages are, by necessity, can only be awarded if they have a connection to the actual negligent conduct. And you pointed out that you're always going to side with the trial court. The trial court agreed with us. It started off with plaintiff's counsel. Plaintiff's counsel, in a reply to our response to his motion of liberty, stated, this is from trial counsel, that we have the burden of distinguishing which of Mr. Sloan's post-negligent conditions were related to negligence and which were related to his underlying condition of esophageal cancer. Now that's the admission of plaintiff's counsel. The trial court agreed with us. This is all we ever wanted was that response. That was fine with us. The judge said the jury has to decide what are the damages for the chemotherapy versus the cancer the gentleman suffered already. This is a quote. They're not going to get to argue that we improperly infused the chemotherapy. He's correct on that. But they will be allowed to argue what damage that caused to a person who already had cancer. So then what happened at trial? That's the same question that we asked. Because after... That statement was made when? On the day of trial? It was on a hearing on the motion in limine to bar all causation evidence. We thought the matter was resolved. But in terms of, do you know Ms. Cronrath, in terms of the start of the trial, was that motion in limine heard that morning, the day before, a week before? I can't off the top of my head give you a chronology there of dates. However, the issue came back out of the blue, resurrected itself if you will, when the court gave the statement of the case to the jury. And out of the blue he said, well I'm going to use the plaintiff's statement of the case. And this is what he informed the jury. He said, defendants have admitted that the infusion of chemotherapy caused William Snow's death. Certainly we objected to that statement of the case. Prior to it being read to the jury? Absolutely. And you had one yourself, correct? You had a proposed statement that had different language. Absolutely, yes your honor. We had a proposed statement that was in line with the prior rulings of the trial court at the motion in limine hearing. Well how did Judge Schmidt explain the change of his position? Whoever trial counsel was pointed out to him, he had previously said he was going to allow this. I reviewed that testimony and his remarks are very short. He doesn't really offer an explanation. We objected, he overruled the objection, and we moved forward. And from that point on, plaintiff's counsel was, throughout that point, from that point on, the trial court sustained objections to all evidence, from our point of view, as to causation. Which injuries were actually caused by our negligent conduct. Remarkably, plaintiff's side were allowed to explore this in detail. We had to put up an offer of proof. The jury never heard our side. Plaintiff's put up a substantial amount of evidence showing that the chemotherapy lessened Mr. Snow's chance of survival. Mr. Unruh, I want to go back to one thing, because you read the plaintiff's statement of the case. The way I read it, it said that the rapid infusion of chemotherapy contributed to cause Snow's death. I prepared my remarks here. I read it right off the transcript, your honor. So if I've made a mistake, I apologize for that. But I pulled this directly from the trial transcript. And what's the record side on that? Do you have it? Can you tell me what volume, even? I cannot. Okay, that's fine. That's fine. What are you reading there, Mr. Unruh? I'm reading notes that I prepared yesterday. And your notes say that the statement of the case said what? That the infusion of chemotherapy caused William Snow's death. And that's the statement that I read from the transcript yesterday. I certainly apologize if I've made a mistake. It may be from the plaintiff's statement. And when the judge read that, he may have omitted the word contributed. I don't know. So we'll have to check the transcript. It's an established rule of law that by introducing evidence at trial pertaining to an issue that had been previously deemed an admission, the introducing party waives any right to rely upon that admission at trial. Now, there is a lot of case law on that, most of it involving discovery. So how does that apply here? The plaintiff successfully managed to bar all of our testimony of causation, claiming that we had admitted causation for all damages from any cause, from any conduct, whether it was related to our negligence in the chemotherapy or not. Basically, he's saying that the 2-610 admission was an admission of proximate causation as to all damages. They put on evidence of causation themselves. Therefore, they waived the right to bar our evidence of causation. That's why we put this in there. That's the argument we've made here. Well, I'm not sure I understand how that works. How is the jury supposed to assess damages without any evidence on board? What I'm saying here, Your Honor, is that the trial court should have allowed us to put on evidence of causation. We should not have been limited to an offer of proof for our causation expert. What did your offer of proof say? Our offer of proof said that there was absolutely no connection between the negligent infusion of chemotherapy and a decrease in the decedent's death. Our experts said that as of, I believe the date is December 10, 2010, the effects of the chemotherapy had completely passed through plaintiff's system, that he no longer suffered any damaging effects from this. We concede that this infusion caused him pain, suffering, and perhaps caused him to enter the nursing home afterwards. But we do not concede that it had any effect beyond that. So there would be the Survival Act basis that they brought? There would be his pain and suffering before he died? Yes. Yes. And as it turns out, Mr. Snow underwent surgery. The pathologist checked the tissue samples that were taken out and found absolutely no evidence of cancer. In other words, our expert would have testified, had he been allowed to, that the chemotherapy and radiation worked, that this case was a success. Now, even a plaintiff's expert admitted that even in a successful treatment of esophageal cancer, that it can recur. I think that that's common knowledge in almost any cancer. And that's what happened here. It had nothing to do, there is no causal link between the recurrence of cancer and the infusion of chemotherapy. So what, in your position, should have been the appropriate measure of damages for the negligent conduct of the hospital? The measure of damages would have been for the pains and suffering that he experienced immediately afterwards, in the weeks following the negligent infusion, plus the care he received in the nursing home. We can see that he was severely debilitated as a result of this infusion. However, by the time he was released from the nursing home, those ill effects had completely passed through his system. His platelet count had risen to, was no longer abnormal. All tests showed that he was cleared for surgery. And when the surgery was performed, it was performed successfully. The plaintiff presented a causation evidence showing that the death of the decedent was linked to the improper infusion of chemotherapy? Their expert, Dr. Rose, suggested that chemotherapy, the whole point is to eliminate microscopic vestiges of the cancer, and that the chemotherapy as given was ineffective, and therefore that there was a causal link with the recurrence. That is his testimony. However, I think it's important to point this out, the plaintiff's expert never testified that to a degree of medical certainty, this patient would have survived had it not been for the negligent infusion. As a matter of fact, his testimony is geared to references to percentages of loss of chance. Now, the lost chance of survival. As a matter of fact, this is some further testimony. This comes from Dr. Rose. He stated, it was the chemotherapy which led to a decrease in his chance of survival. Later on, counsel, plaintiff's counsel, I believe, asked him, in your opinion, to a reasonable degree of medical certainty, might or could Mr. Snow have survived between three and five years had he received normal therapy? The answer, yes. Yes, there was. He did not have that chance. The causation evidence that plaintiff produced does not establish that the chemotherapy infusion caused Mr. Snow's death. Rather, the evidence supports a claim for lost chance of survival. We believe that, and we've asserted this in our brief, that there is a complete failure of proof that defendant's conduct actually caused Mr. Snow's death. The question was never asked, and the question was never answered, that to a reasonable degree of medical certainty that our chemotherapy caused his death. At most, the testimony establishes, from plaintiff's point of view, that there was a lessened chance of survival. This brings to another point, which is the medical bills themselves. This is an issue controlled by Gil V. Foster. The Supreme Court has held that a plaintiff fails to meet their burden of proof where the medical bills related to the negligent conduct are commingled with unrelated charges. Now, in their responsive brief, plaintiffs pointed out, they said, well, we didn't bill for the surgery. Well, okay, that's a start. But you look at the diagnosis codes for some of these things that are the bills that were asserted, and we have charges for diabetes, peripheral vascular disease, spinal degeneration. We have a number of bills here that are not causally related or related in any way to the cancer itself. Now, Dr. Rose was allowed to testify without ever having seen these bills that they were reasonable. He said, well, you know, that's about right. That's 200,000 is a good number. Did you object to that? Certainly did, absolutely. What was the trial judge's explanation? It was done in an evidence deposition, and the objection was crossed out. In other words, the objection was overruled. But there's nothing on the record as to the judge's reasoning on that. Now, in Gil, they tried the same thing. They brought in the head of, I believe, a vice president of the finance department of the hospital, and he said, well, yeah, these bills are pretty reasonable. The trial court in Gil said, well, that's not enough. Just to look at these bills as a whole without having them separated, without having them identified, which bills go to what, that's insufficient. Now, in Gil, that expert, that vice president, he actually saw the bills. Dr. Rose never laid eyes on them. Now, to suggest that we have a lack of foundation here is a bit of an understatement. He had no idea what he was talking about. He looked at the bottom line. He said, yeah, that sounds about reasonable. And that, under Gil v. Foster, is insufficient. That is a complete failure on their burden of proof. I see my time is limited. We have one other issue which appears to have been disposed of by a recent decision of this court in the Miller v. Sarah Bush Lincoln case under 2-1205. We have not really considered how that affects. I see my time is up. Yes, it is, counsel. You can finish your sentence. We have not fully worked through how this applies to our case. We have questions as to whether it applies to the supplemental insurance provided by AARP, and we further question whether any scenario can be developed where a set-off under 2-1205 would be upheld. That concludes my remarks. Are there any questions? Thank you, counsel. We'll hear from you on rebuttal. Counsel, you may proceed. Good morning, Your Honors. My name is Harry Lee, and I, along with Jenna Romagnoli, represent. You have to speak up, counsel. I'm sorry. I, along with Jenna Romagnoli, represent the Plaintiff Appellee in this case, Dorothy Snow. May it please the court. I'll address each of the issues that seem to be of most interest to the court. I'd like to start with the Gill issue first, since it was one of the last issues referenced by counsel. The clear distinction between the Gill situation and this situation is there is absolutely no evidence that Mr. Snow would have been hospitalized for cancer, none whatsoever. The only evidence is that, and I believe the other side conceded, that he was hospitalized because of this megadose or overdose of the chemotherapy. Mr. Lee, do you know how that mistake was made? How did the nurses at SIU, how were they able to deliver four days through a rapid infusion in 30 to 60 minutes? I do not know that. I really do not. That didn't come out in discovery? If it did, I'm not aware of it. I simply know that the effect on Mr. Snow was devastating, and as demonstrated by the law on hospitalization, the considerable time spent in the nursing home. Well, we have two different claims here. We have the survival act and wrongful death. Yes, correct. Mr. Unrath seems to agree that the survival act for pain and suffering and all the rest of that, there's no problem. He contests the wrongful death. Right, where the damages were $47,250. Say again? The damages in the wrongful death aspect of this case was $47,250. Okay. Well, using that as a general figure, why isn't he correct that the defense should be able to present evidence to the jury suggesting that their negligence with regard to the chemotherapy was not the proximate cause of the death of Mr. Snow? Two reasons. One is the amended answer. You have to speak up, counsel. I'm sorry, Your Honor. Even with my hearing aids, I'm still having trouble hearing you. The microphone really doesn't amplify. Yeah, that's a recording device, not an amplifier. I should know that by now. Okay. The first answer, of course, is the amended answer that was filed in this case. And I think it's very clear from the amended answer that all that was being contested in this case was the amount of damages. And to understand that, I think you need to first look at the language of this amended answer. And it clearly states that. And then when it gives an example of what they are not admitting to, they say specifically, we are not admitting to any suggestion that our conduct was cruel or indifferent or constituted willful wanton or deliberate conduct. Nothing else. And then they repeat it. Well, to the extent that this is ambiguous, and I think you're right that they certainly should have made this more clear, didn't they make it more clear prior to trial that, wait a minute, we're not admitting that there's proximate cause of the death. We're admitting that we were negligent in the infusion. And we want to present this other evidence. They did say that. Okay. And Judge Schmidt, who was on this case from the very beginning, was aware of the way this case was being litigated by the other side. And by that, I would refer the court to the failure to respond to discovery on their part. The failure to respond to discovery in what way? Well, we never were able to take the depositions of the nurses for number one. And then there was a failure to respond to some of the written discovery in this case, for which there were two motions to compel filed. There was a conference, a telephonic conference held with Judge Schmidt regarding this issue. There was an apology by prior trial counsel from the defense firm for his lack of diligence in discovery. But then even after that, there was a lack of diligence. And it was not until we filed a motion for default and a motion for summary judgment that they then filed this amended answer. And also, this was after a trial date had been scheduled and it had been extended at the request of the defense. So Judge Schmidt was totally aware. So before all of this, they never made it clear that they were contesting proximate causation with regards to the wrongful death claim? Not until, I believe, August of 2014. When was the trial? The trial was in September of 2014. So we're talking about 30 days or less before trial? We're talking about 30 days or less. I believe that's correct. My brief would have the actual date. They attempted to file a second amended answer that would really clarify this, and Judge Schmidt denied that. That's right. And again, I think to understand the judge's denial, you have to understand the context of this matter, what had preceded that attempt to file an amended answer. And you have to also consider the clear language of this particular amended answer. But yet, prior to trial, just prior to trial, didn't Judge Schmidt say, this is the issue? Did this negligence cause all these damages? I think if you follow Judge Schmidt throughout the trial, the message he sent was, I think he said something, you have to dance with the person you brought. Say that again? I think Judge Schmidt made a comment that you have to dance with the person you brought, or something to that effect. And by that, he was referring to the fact that they had filed this amended answer, in which they admitted everything but the amount of damages. But didn't he make that statement after they had filed that? Oh, yes, he did. He made that later in the trial. I think that may have been at the time of the directed verdict. And when I say that statement, I'm talking about the statement as to what they would be allowed to contest. Wasn't that statement made after they had filed this ambiguous answer? Yes, it was. Which ambiguous answer? This is a pretty clear amended answer. Well, I mean, we can, I guess, debate that. But my point is, after that had been filed, it still seemed to be Judge Schmidt's understanding that he would allow them to contest what damages actually stem from the conduct of the rapid infusion. Do you agree? No, I don't agree. I think that the judge made the comment that certainly Mr. Unruh indicated that the judge made. So what does that comment mean to you? I think what it means to me is that the judge indicated those words, but the judge did not intend to suggest that defendants would be permitted to proceed in a manner contrary to the amended answer, which they filed in this case. And so are you suggesting that the judge ruled the way he did or conducted things the way he did during the trial as a means of punishing the other side for inappropriate behavior or lack of diligence? I don't know if punishment is the right word. Or sanctioned them? I don't think there was no indication of any sanction or any punishment. I think the court simply was abiding by the amended answer that defense counsel chose to file in May of 2014 at a point where this case was. What did they say in the amended answer in May 2014? They said these defendants state they're pursuant to Section 216. Okay. But they attempted to change that subsequently, didn't they? They did. Okay. Well, leaving this all aside, as a matter of law, isn't it correct that they're able to challenge the wrongful death on the basis that the proximate cause wasn't present? Putting this admission aside? Yes. Yes. Yeah. Had they said, as they should have, by the way, just to be real clear here, we are conceding that we behaved negligently. We are conceding the negligence as the proximate cause of the Survival Act claims, pain and suffering, as Mr. Emmerich pointed out. But we are contesting that this negligent behavior caused the death under the Wrongful Death Act. Had they said that, there would be, number one, no confusion, and number two, there would be a correct statement in the law, wouldn't it? Absolutely. And the testimony they wanted to offer, for instance, challenging your causation testimony as to the wrongful death would have been properly admitted, wouldn't it? Right. And then we'd have a jury question. The jury would decide whom they believe on that. Or they simply could have said in this amended answer. You have to speak up, counsel. I'm sorry. Or they could have what? Or they could have said in this amended answer that they desire to contest causation and the amount of damages. They didn't need to go into all of that explanation, all of that length. They could have simply said it that way. Well, what's troubling here is we're talking about a medical malpractice case where we have an ambiguous answer that at some point they attempted to clear up, and it's not even clear to me how the ambiguous answer misled you. You know, to the extent we should be concerned with a trial on the issue and the merits of letting the jury decide, why should this ambiguous, call it faulty, response that shouldn't really have misled you or the court, why should that have trumped the subsequent trial efforts? I would disagree with the court that it did not mislead us. It did mislead us. So you thought they were abandoning their wrongful death claims? No, we thought that the only issue that they were contesting on the wrongful death claim was the amount of damages. Now, the amount of damages on a wrongful death claim are damages that go to the next of kin, the surviving spouse of the next of kin. That's the amount of damages on a wrongful death claim. If you contest only the amount of damages on a wrongful death claim, you're accepting the death because that's part, that's one of the elements of a wrongful death claim. So if you're contesting only the amount of damages, you're contesting only the amount of damages for that death. Otherwise, you would not be conceding the liability or admitting to liability on wrongful death. It's much different than a personal injury action where you could have this concept of a non-compensable. Well, but this isn't an usual case because you have a survival act claim and a wrongful death act claim. There are many cases with survival act and wrongful death. But we might, as here, have different aspects of it where if you concede, to their credit, they're conceding negligence. It was bad. We shouldn't have done this. Now, let's talk about the effects. But if you concede negligence to a wrongful death action, you're conceding negligence for the death. Well, that would be true if it were just wrongful death and survivor. But we have a survivor action brought here as well. And it's hard for me to understand how you were misled or the court was misled by this statement. At what point, for instance, when did they present their expert witness who would have said, by the way, the negligent chemical infusion had nothing to do causing this guy's death, Mr. Snow? When did they present that? I'm not sure Dr. Raul, and counsel can correct me if I'm wrong, but I'm not sure Dr. Raul was designated as an expert. He was a treating doctor. And what happened with regards to their disclosure of expert, which is another indication of the way this case was tried, was that there was a discovery cutoff for expert disclosure. That was missed. Defendants came in and requested an extension of time to submit their disclosure. Judge Schmidt granted them the extension of time. They missed that also. And then on the eve of trial, they attempted to disclose experts, and the judge said, no, it's too late. You mean it was the eve of trial when this expert that Mr. Unrath referred to? No, no. Dr. Raul, again, is the treating doctor, I believe. Okay. And he's the one who said that the chemical infusion would – I believe that was Dr. Raul because I don't recall seeing any – Okay.  – offer a proof regarding any other expert that was presented at trial. Well, but once you heard that testimony, clearly that should have put you on notice that they're not conceding the wrongful death claim. That was an offer of proof made during the very last witness in the case. And that was the first time this was presented to you? No, Raul would have testified to that in his deposition, right? Is that right? I believe so, yeah. When was that deposition? That I do not know. Pardon? I do not know that, Your Honor. So if Raul testifies in his deposition that the chemical infusion did not cause or lead to the death of Mr. Snell, that would have been a pretty clear indication that the defense is not going to be conceding that aspect of this case, wouldn't it? In their mind, they weren't conceding the aspect of this case. But in the judge's mind, the answer that was filed by the defendants did, in fact, concede it. I want to ask you about the motion in limine. The plaintiff filed the motion in limine to bar evidence of causation. Is that correct? Bar defendants from putting on evidence of causation. You would have? Yes. Yes. And Judge Schmidt ruled, we're going to allow arguments that the damages plaintiffs seek were not caused by the improper infusion of chemotherapy. The jury has to decide what are the damages for chemotherapy versus the cancer the gentleman suffered already. That's going to be, in my mind, that's going to be the trial. And then he said, defendants are not going to get to argue we properly infused the chemotherapy. They have said they didn't. But they will be allowed to argue what damage that caused to a person that already had cancer. So, in effect, he was denying your motion in limine. And then what happened? How did this happen at trial? I think that the judge took another look at the amended answer, and the judge concluded that that's what the amended answer indicated, that they had admitted everything but the amount of damages in this case. Were the parties put on notice to that change? Well, I believe the court made it clear. I mean, prior to the rulings during trial? Throughout trial, I mean, from the very beginning, the opening statements, there were statements made and objections made to statements regarding admitting liability as to causation and only the amount of damages being involved. And so from the very beginning, the parties were aware that that, in fact, was the judge's ruling. The very beginning of the trial, the parties became aware that the judge was ruling in contradiction to the ruling that had previously been made in that motion in limine. Well, you know, I think you have to view that statement in the context of everything in this trial and in view of everything that the judge ruled on and all of the objections that were sustained or overruled with regards to causation. I mean, it was very clear. I mean, if you can pull one statement and say that that is what this amended answer means. But a judge's ruling, that's a pretty important statement, right? Shouldn't the parties be able to rely on that? But an amended answer is also something that parties should be able to rely upon. But the ruling was after the amended answer, wasn't it? Yes, it was, Your Honor. Well, then, and also when prior to trial did that ruling occur, your motion in limine? That would have been either a couple days before or the day before the start of trial. It was not, you know, between August and September there was not a great time period, so it would have to be somewhere in between there. Mr. Lee, I'm going to ask this question. I'm going to ask Mr. Unrath when he gets back up. But have the two of you or trial counsel talked about trying to settle this matter? Well, I just want a yes or no because it seems to me this is the type of case that it would be productive to spend some time talking settlement. And if the two of you decide that you want to do that, you should notify us so that we hold off on issuing our decision for a short length of time. And maybe before you both leave the building today, you could let our clerk know and give yourselves a cutoff, like a week or two weeks, to get those settlement discussions to talk about it. If we don't hear from you and you don't notify us, we'll issue our decision. I appreciate your offer and your suggestion. And since one of the trial counsels is here, we can certainly discuss it. I'm sure that up to this point, there have been attempts to resolve this case. And those attempts, I would assume, were unsuccessful, which is why we're here today. I'll be with a little nudge from this panel. It will make it a little more productive. I appreciate it, Your Honor. As far as the other issues in this case are concerned, the Miller decision, of course, addressed the reduction issue. And the only thing we add with regards to the reduction issue in this case is this is not a 2-1205 situation. If anything, it's a 2-1205.1 situation. That being because the defendants in this case were not a licensed hospital or a physician. It was an Illinois corporation. There was absolutely no evidence presented in trial that this Illinois corporation was a physician group, and the other defendants were nurses. I can't hear you, counsel. Pardon me, Your Honor? I could not hear your last statement. There was no evidence presented that what? There was no evidence presented in this case that the defendant, SIU Healthcare, was a physician's group. What about the question of the extent of damages that Mr. Unrath raised where he says your physician, expert witness, didn't even look at the claims for what the damages were for? Well, what he did, I think what the test is, is whether he had knowledge. Go ahead, please. The test is whether our expert had knowledge of the services that were rendered and the usual and customary charges for those services. He did testify that he had hospitalized people and patients in the past for the very conditions that Mr. Snow had. He also testified that he had been practicing for 26 years and had done so. He also testified that he was familiar with the usual and customary costs of such services. Does Mr. Unrath argue, doesn't Gill v. Foster require that they actually have looked at the bill and be able to form an opinion based upon having done so? No. And, again, that was the point I was trying to make initially when I apparently was not speaking loud enough. The clear distinction between the Gill case and our case is there you had an injury that needed to be taken care of in the hospital. There was a need to repair a herniated stomach in Gill. There was absolutely no testimony in this case that Mr. Snow would have ended up in the hospital simply because he was being treated for cancer. What put him in the hospital, and the other side conceded this, what put him in the hospital was the overdose or the megadose of the chemo. So that's the clear distinction between the two cases, between Gill and this case. Thank you, counsel. Thank you, Your Honor. And, again, we ask the Court to affirm. Thank you. Any rebuttal, Mr. Unrath? Very briefly. It was brought up the fact that the 2-610D pleading listed only one exception, the fact that we did not admit to any punitive damages or deliberate indifference. Granted, in hindsight, the 610 pleading could have been more specific. However, the reason that this was included, the exception for deliberate indifference, is because that could potentially be directly related to the infusion of chemotherapy. There could be a claim made that putting a four-day dose into a patient in a single hour constituted deliberate indifference. So it was essential that he point this out, that we were not conceding anything as far as punitive damages. However, as I've argued, we believe that it's implicit that a court cannot award damages for injuries that are unrelated to the negligent conduct. And that, our trial counsel presumed, I'm assuming, I'm trying to read his mind, he presumed that the court could never do such a thing. Mr. Unrath, are we taking Judge Smith's ruling out of context, what he said as suggested by opposing counsel, that we need to look at this in the context of how the trial went forward? I don't really understand, but are we missing something? Was the ruling the ruling? Is there something else we should be considering with respect to when he specifically stated your side would be able to argue that point? I believe that taking the trial counsel's conduct into account would be a mistake. I don't see how that could possibly affect the judge's ruling on an issue of law. And if it did, it shouldn't have. Prior counsel made a number of mistakes, or perhaps it would be better said that he was not diligent. And I think that the record stands for itself there. All I can say is that he's no longer with our firm. Oh, by the way, counsel did make reference to a quote from the judge. The judge, I believe that his exact words were, you have to dance with the person you brought to the ball. I think those were the words he used. And at that time what we were trying to do was to do precisely what this court has suggested, that we were trying to clarify the 2-16610D admission. We were basically saying that, no, we do not admit proximate cause for any injuries or damages unrelated to the infusion. Plaintiff, earlier on the panel asked whether plaintiff was misled by our 2-610D pleading, and I would submit that they were not misled. That, as I pointed out earlier, in their reply to our response to the motion in limitee that sought to bar all causation evidence, they admitted that, yes, we do have a burden here to prove proximate causation as to those damages that relate to infusion and those damages that relate to the surgery. So I respectfully suggest that they could not possibly be misled. There was also a question about Dr. Rao's testimony, and I think you're right. He was a treating physician. We made an offer of proof. Our expert was Dr. Stephen Allen. Dr. Stephen Allen was disclosed, I believe, about three months prior to trial. So it was apparent exactly how we intended. He was the one who would have testified that there was no connection? Absolutely. It wasn't Dr. Rao? I believe Dr. Rao would have testified to that conclusion, but he was not allowed to testify. We also tried to... Counsel, I'm sorry. I need to interrupt you. Was there a deposition of either of those physicians by the plaintiff? Absolutely. Dr. Allen's deposition was taken, and certainly we had to disclose his opinions in advance of trial.  We did make an offer of proof. That offer of proof is in the record. So to conclude, I can't imagine how they could possibly have been misled by this pleading when, number one, we disclosed an expert stating that we contested causation, and also we have the ruling not only of the trial judge, but we have the plaintiff's counsel's admission that he agreed with us, that he has to separate out causation as to these matters. Counsel, you're out of time. I would ask that the parties remember Judge Pope's suggestion and notify us. Mr. Unrath, if you'd stay in the building and talk to Mr. Lee and counsel today before you leave, at least about whether or not you anticipate having settlement discussions. The thing is this. If your side prevails, that means a retrial on this. You could face an increased amount of damages. You have no idea what a jury would do. And in this case, there's clear admitted negligence, and it's clear there was negligence here. If you both would report to the clerk's office before you leave about whether or not you plan to engage in settlement discussions, and I would like you to do that and get an answer to us whether those settlement discussions have been successful or not within 14 days of today. Okay? Thank you very much. Thank you.